# EXHIBIT 1

**DEPARTMENT OF THE
CORPORATION COUNSEL**   205

VICTORIA J. TAKAYESU   5481
Corporation Counsel
THOMAS KOLBE            7679
Deputy Corporation Counsel
County of Maui
200 S. High Street
Wailuku, Hawaii 96793
Telephone: (808) 270-7741
Facsimile:  (808) 270-7152
thomas.kolbe@co.maui.hi.us

**CRONIN, FRIED, SEKIYA,
KEKINA & FAIRBANKS**
L. Richard Fried, Jr.       0764-0
Wayne K. Kekina           0780-0
Patrick F. McTernan        4269-0
600 Davies Pacific Center
841 Bishop Street
Honolulu, Hawai'i 96813
Telephone: (808) 524-1433
Facsimile:  (808) 536-2073
rfried@croninfried.com
pmcternan@croninfried.com

**BARON & BUDD, P.C.**
John P. Fiske (CA SBN 249256)
(*Pro Hac Vice Forthcoming*)
Victoria Sherlin (CA SBN 312337)
(*Pro Hac Vice Forthcoming*)
Taylor O'Neal (CA SBN 336077)
(*Pro Hac Vice Forthcoming*)
11440 West Bernardo Court Suite 265,
San Diego, CA 92127
Telephone:  (858) 251-7424
Fax: (214) 520-1181
jfiske@baronbudd.com
tsherlin@baronbudd.com
toneal@baronbudd.com

**Electronically Filed
SECOND CIRCUIT
2CCV-23-0000238
24-AUG-2023
08:56 AM
Dkt. 1 CMP**

1

**DIAB CHAMBERS LLP**
Ed Diab (CA SBN 262319)
(*Pro Hac Vice Forthcoming*)
Robert J. Chambers, II (CA SBN 244688)
(*Pro Hac Vice Forthcoming*)
10089 Willow Creek Rd., Suite 200
San Diego, CA 92131
Tel: (619) 658-7010
ed@dcfirm.com
rob@dcfirm.com

*Attorneys for Plaintiff COUNTY OF MAUI*

*[full caption and title on following page]*

2

IN THE CIRCUIT COURT OF THE SECOND CIRCUIT

STATE OF HAWAI'I

| | | |
|---|---|---|
| COUNTY OF MAUI, | ) | CIVIL NO. _____ |
| | ) | (Other Non-Vehicle Tort) |
| Plaintiff, | ) | |
| | ) | **COMPLAINT; EXHIBIT "A";** |
| vs. | ) | **DEMAND FOR JURY TRIAL;** |
| | ) | **SUMMONS TO ANSWER A** |
| MAUI ELECTRIC COMPANY, | ) | **CIVIL COMPLAINT** |
| LIMITED; HAWAIIAN ELECTRIC | ) | |
| COMPANY, INC.; HAWAI'I ELECTRIC | ) | |
| LIGHT COMPANY, INC.; HAWAIIAN | ) | |
| ELECTRIC INDUSTRIES, INC. and | ) | |
| DOES 1 THROUGH 50, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| | ) | |
| _____ | ) | |

## **COMPLAINT**

Public Entity Plaintiff COUNTY OF MAUI ("Plaintiff" or "MAUI COUNTY") brings this action for damages against Defendants MAUI ELECTRIC COMPANY, LIMITED; HAWAIIAN ELECTRIC COMPANY, INC.; HAWAI'I ELECTRIC LIGHT COMPANY, INC.; HAWAIIAN ELECTRIC INDUSTRIES, INC.; and DOES 1 through 50, inclusive, as follows:

## **INTRODUCTION**

1.    Plaintiff brings this action for damages against Defendants MAUI ELECTRIC COMPANY, LIMITED, ("MECO"), HAWAIIAN ELECTRIC COMPANY, INC. ("HECO"), HAWAI'I ELECTRIC LIGHT COMPANY, INC. ("HELCO"), HAWAIIAN ELECTRIC INDUSTRIES, INC. ("HEI") and DOES 1 through 50, inclusive (collectively "Defendants"), for damages suffered arising out of three fires that started on August 7-8, 2023.

2.      The first fire, known as the "Lahaina Fire," first ignited at approximately 6:37 a.m. on August 8, 2023, near the town of Lahaina on the Island of Maui, State of Hawai'i.  The second fire, known as the "Kula Fire," started at or around 11:30 a.m. on August 8, 2023 in the Upcountry area in Kula.  And the third fire, known as the "Olinda Fire," ignited at approximately 10:47 p.m. on August 7, 2023.  From time to time throughout this Complaint, the Kula Fire, Olinda Fire, and Lahaina Fire may be collectively referred to as the "Maui Fires."

3.      The Kula Fire burned through more than 200 acres in the community of Kula, in the area of Upcountry Maui and completely destroyed at least 15 structures.

4.      The Olinda Fire burned through more than 1,000 acres in the town of Kula and destroyed multiple structures.

5.      The Lahaina Fire burned through the first capital of the former Hawaiian Kingdom, leaving the entire historic town of Lahaina in utter devastation. The fire burned over 2,000 acres, completely destroying homes, businesses, churches, schools, and cultural sites.  The town served as a major whaling port and fishing town in the 1800s due to its location on whale migration routes. Lahaina is also known for the first high school and the first printing press in Hawai'i, as well as the introduction of the written form of the Hawaiian language dating back to the early 1800s.

6.      In 1962, Lahaina was designated a historical landmark.  Davianna Pomaika'i McGregor, a founding member of the ethnic studies program at the University of Hawai'i, Manoa, and a historian of Hawaii and the Pacific, said Lahaina served as a "very active political, economic and intellectual heart" during the 19th century.  Several historic structures and landmarks were damaged or destroyed in the fire including the oldest house in Maui known as the Baldwin Home, built in 1834.  Kings and queens were buried at Waiola Church, the first Christian church on Maui, which was also lost in the fire. The Old Lahaina Courthouse operated in 1860 as a customs house

for trade and whaling ships.  More recently, it housed the Lahaina Heritage Museum and its physical collection of artifacts from Lahaina's history, ranging from the ancient Hawaiian period to the town's whaling era.  It, too, sustained significant damage in the fire.  As the periodical "The Guardian" called it, Lahaina is a "site of incalculable Native Hawaiian importance."[1]

7.     In modern times, to say Lahaina is a tourist destination is an understatement. Known for its incredible beaches, world-class snorkeling, and boating offerings, the impact to tourism will be felt for years.  In its nearshore waters, the environmental impact to the reefs, surrounding waters and wildlife in many instances will be permanent or take decades to recover.

8.     The devastating Lahaina Fire also claimed the lives of many people.  As of the filing of this Complaint, the death toll reached 115 and is sadly expected to rise.  Other victims suffered severe burns, smoke inhalation, and other serious injuries.  The Lahaina fire marks the most destructive and deadliest human-made disaster in Hawai'i history.

 

9.     Even though the National Weather Service ("NWS") issued a High Wind Watch and Red Flag Warning and cautioned both MECO and HECO that the damaging winds could

---

[1] https://www.theguardian.com/us-news/2023/aug/15/maui-wildfires-lahaina-hawaii-rebuild

knock down power lines and that any fires that developed would likely spread quickly, Defendants inexcusably kept their power lines energized during the forecasted high-fire danger conditions.

10.    Defendants' inactions caused loss of life, severe injuries, complete destruction of homes and businesses, displacement of thousands of people, and damage to many of Hawaiʻi's historic and cultural sites.

11.    Plaintiff is among those damaged by the fire as a result of Defendants' failure to shut off their powerlines during the dangerous and forecasted fire conditions.









12.     Preliminary numbers from the Pacific Disaster Center and the Federal Emergency Management Agency ("FEMA"), estimate that the cost to rebuild and restore the damage from the Lahaina Fire, alone, is upwards of $5 billion.[2]

---

[2] https://www.theguardian.com/us-news/2023/aug/15/maui-wildfires-lahaina-hawaii-rebuild

13.     Had Defendants heeded the NWS warnings and de-energized their powerlines during the predicted high-wind gusts, this destruction could have been avoided.

## JURISDICTION AND VENUE

14.     Venue is proper because all of the events, acts, and omissions complained of occurred in Hawai'i, within the jurisdiction of this Court.

15.     The amount in controversy meets or exceeds the jurisdictional minimum of this Court.

## THE PARTIES

### A.    PLAINTIFF

16.     Plaintiff MAUI COUNTY is a political subdivision duly organized and existing by virtue of laws of the State of Hawai'i.  MAUI COUNTY suffered and/or continues to suffer property losses and other damages as a result of the Maui Fires including, but not limited to: loss of natural resources, open space, and environmental assets; emergency response and fire suppression costs; loss of tax revenues, including but not limited to property, sales, and transient occupancy taxes; losses from impacts to business-like activities; debris removal costs; staff time and labor costs; damage to infrastructure, including but not limited to roads, sidewalks, water, stormwater, sewer systems, culverts, and other public-entity owned infrastructure; damages related to soil erosion and loss of soil stability and productivity; loss of trees; damages related to water contamination including water quality preservation and correction expenses; loss of water storage; loss of aesthetic value; and, other significant damages and losses unique to public entities.

17.     Plaintiff MAUI COUNTY seeks just compensation and damages as more particularly described below.

B.      DEFENDANTS

18.     Plaintiff is informed and believes that Defendant MECO is a public utility company headquartered in Maui, Hawaiʻi that owns, controls, operates, and/or manages one or more energy plant and equipment that is directly or indirectly for public use for the production, conveyance, transmission, delivery, or furnishing of light and power in the State of Hawaiʻi pursuant to chapter 269 of the Hawaii Revised Statutes (HRS).  Its principal place of business is in Maui County at 210 Kamehameha Avenue, Kahului, HI 96732.

19.     Plaintiff is informed and believes that Defendant HECO is doing business in the State of Hawaiʻi, in the County of Maui.  Plaintiff is informed and believes Defendant HECO is the Principal Subsidiary of Defendant HEI.  Defendant HECO is a public utility company headquartered in Honolulu, Hawaii that owns, controls, operates, and/or manages one or more energy plant and equipment that is directly or indirectly for public use for the production, conveyance, transmission, delivery, or furnishing of light and power in the State of Hawaiʻi pursuant to HRS chapter 269. Defendant HECO is the parent company of Defendants MECO and HELCO.  It does regular, sustained business throughout Hawaiʻi, including in Maui County. Its principal place of business is in Honolulu at 820 Ward Avenue, Honolulu, HI 96814.

20.     Plaintiff is informed and believes that Defendant HELCO is a subsidiary of Defendant HECO.  Defendant HELCO is a public utility company headquartered in Honolulu, Hawaiʻi that owns, controls, operates, and/or manages one or more energy plant and equipment that is directly or indirectly for public use for the production, conveyance, transmission, delivery, or furnishing of light and power in the State of Hawaiʻi pursuant to HRS chapter 269. It does regular, sustained business throughout Hawaiʻi, including in Maui County. Its principal place of business is in 54 Halekauila St., Hilo, HI, 96720.

21.     Plaintiff is informed and believes that Defendant HEI is the parent company of HECO, MECO, and HELCO, doing business in the State of Hawaiʻi, including the County of Maui.  Plaintiff is informed and believes that HEI is a publicly traded, investor-owned utility company that owns, controls, operates, and/or manages one or more energy plant and equipment that is directly or indirectly for public use for the production, conveyance, transmission, delivery, or furnishing of light and power in the State of Hawaiʻi pursuant to, respectively, HRS chapter 269.  HEI is in the business of providing electricity to the residents of Maui County, including but not limited to those residing in the communities of Lahaina and Kula, through a network of electrical transmission and distribution lines.  It is the largest supplier of electricity in the State of Hawaiʻi.  It does regular, sustained business throughout Hawaiʻi, including in Maui County.  Its principal place of business is in Honolulu at 1001 Bishop Street, Suite 2900, Honolulu, HI 96813.

22.     HEI, through HECO and its subsidiaries, serve about 95% of the population in the State of Hawaiʻi with public utility services and services relating to the generation of energy, transmission of electricity, generation of electricity, and distribution of energy. Collectively, these Defendants own about 3,000 miles of electrical transmission and distribution lines in the State of Hawaiʻi. More than 40% of these lines are underground. Further, Defendant HECO is the sole owner of 50,000 utility poles.

23.     "Defendants" refers collectively to Hawaiian Electric Industries, Inc., Hawaiian Electric Company, Inc, Hawaiʻi Electric Light Company, Inc., and Maui Electric Company, Limited.  Defendants supply electricity in the State of Hawaiʻi.  They own, design, construct, operate, maintain, and repair powerlines and other equipment to transmit electricity to residents, businesses, schools, and industries in the State of Hawaiʻi, including in and around the ignition points for the Maui Fires.

24.     Plaintiff alleges on information and belief that HEI, HECO, MECO, and HELCO are jointly and severally liable for each other's negligence, conduct and wrongdoing as alleged herein, in that:

a.     HEI is the sole holder of HECO common stock;

b.     HECO, MECO, and HELCO operate as a single business enterprise operating out of the same building located at 1099 Alakea Street, Suite 2200, Honolulu, Hawaii 96813 for the purpose of effectuating and carrying out HEI's business and operations and/or for the benefit of HEI;

c.     Defendants do not operate as completely separate entities, but rather, integrate their resources to achieve a common business purpose;

d.     HECO, MECO, and HELCO are organized and controlled, and their decisions, affairs, and business so conducted as to make them a mere instrumentality, agents, conduits, or adjuncts of HEI;

e.     HECO, MECO, and HELCO's income contribution results from function integration, centralization of management and economies of scale with HEI;

f.     Defendants' officers and management are intertwined and do not act completely independent of one another;

g.     Defendants' officers and managers act in the interest of HEI as a single enterprise;

h.     HEI has control and authority to choose and appoint HECO, MECO, and HELCO board members and well as to officers and managers;

i.     Defendants do not compete with one another but have been structured and organized and integrated as a single enterprise where various components operate in concert with one another;

j.     HEI maintains unified administrative control over HECO, MECO, and HELCO;

k.     Defendants share the same insurance carriers and provide uniform or similar employee benefit plans;

l.     Defendants have unified personnel policies and practices; and

m.     HEI's written guidelines, policies, and procedures control HECO, MECO, and HELO, and their employees, policies and practices.

25.     Plaintiff has reviewed public and other available records in order to ascertain the true names and capacities of all defendants in this action. The true names and capacities of all responsible parties are unknown to Plaintiff. Plaintiff is unable to ascertain the identity of the defendants in this action designated as DOES 1 through 50, inclusive.

26.     The DOES 1 through 50 Defendants are sued herein under fictitious names for the reason that their true names and capacities are unknown to Plaintiff, except that they may be connected in some manner with the named Defendants, such as being partners, principals, agents, employees, employers, servants, representatives, joint venturers, associates, or independent contractors of Defendants and/or were in some manner presently unknown to Plaintiff, engaged in activities such as designing, manufacturing, selling, distributing, installing, and/or providing materials and/or services to Defendants. The DOES 1 through 50 Defendants' true names, identities, capacities, activities, and/or responsibilities are presently unknown to Plaintiff or his attorneys. Plaintiff prays for leave to amend this complaint to show the true names and capacities of DOES Defendants when they are ascertained.

## GENERAL ALLEGATIONS

### General Known Fire Risk to Maui

27.     The great threat of hurricanes and their attendant high wind gusts regularly loom over the State of Hawaiʻi. A number of hurricanes endanger the state each year. Climate change makes hurricanes more powerful and ferocious, greatly increasing the peril for Hawaiʻi, state-wide.

28.     Since 2000, more than 20 hurricanes or their remnants have impacted or nearly impacted Hawaiʻi, 13 of which have occurred since 2010.  More recently, dozens of hurricanes or tropical storms made landfall or passed within miles of Hawaiʻi's shores.

29.     Nearly a decade ago, the Hawaiʻi Wildfire Management Organization ("HWMO") issued its 2014 Wildfire Mitigation Plan that warned Lahaina that it was among Maui's most fire-prone areas. This was based on factors such as its proximity to grasslands, steep terrain, and frequent high winds. The HWMO outlined a plan for working with utilities to help reduce the risk of fires.[3]

30.     In 2020, researchers from the University of Hawaii and the East-West Center attributed fires in Maui and Oahu to winds from Hurricane Lane.[4]

31.     In this 2020 report, titled "Fire and Rain: The Legacy of Hurricane Lane in Hawaiʻi," published in the American Meteorological Society's Journal, found that neither thunderstorms nor lightning started the fire. The Honolulu Fire Department attributed the Oahu fire to powerlines arcing in Hurricane Lane's powerful, high wind gusts. The fires in Maui

---

[3] Dan Frosch & Jim Carlton, *Hawaii Officials Were Warned Years Ago that Maui's Lahaina Faced High Wildfire Risk*, WALL STREET JOURNAL, (Aug. 11. 2023)
[4] Id.

"required significant suppression resources," which included more than 70 county firefighters and additional support from other state airport firefighting crews.

32.    The 2020 Maui County Hazard Mitigation Plan Update depicts Lahaina and all Lahaina buildings as occupying a "High" Wildfire Risk Area (see below).



Figure 256. Buildings in Wildfire Risk Areas in Southern West Maui Community Planning Area.

33.     The 2020 Maui County Hazard Mitigation Plan Update also warned that western portion of Maui has a "Highly Likely (greater than 90% annual chance)" probability of experiencing wildfires (see below).

Fire data indicated 80 wildfires directly impacted Maui County between 1999 and 2019. This results in approximately four fires every year occurring within the county overall. However, not all of Maui County's community planning areas have the same likelihood of experiencing wildfires. The table below shows the annual probability for the wildfire hazard for each community planning area.

*Table 68. Wildfire Probabilities for Maui County Community Planning Areas.*

| Community Planning Area | Landslide Probability |
|---|---|
| Hāna | Likely (10% to 90% annual chance) |
| Kīhei-Mākena | Likely (10% to 90% annual chance) |
| Lāna'i | Possible (1% to 10% annual chance) |
| Makawao-Pukalani-Kula | Likely (10% to 90% annual chance) |
| Moloka'i | Likely (10% to 90% annual chance) |
| Pā'ia-Ha'ikū | Likely (10% to 90% annual chance) |
| Wailuku-Kahului | Likely (10% to 90% annual chance) |
| West Maui | Highly Likely (greater than 90% annual chance) |

34.     Consistent with Hawai'i authorities and agencies, FEMA's April 2023 Wind Retrofit Guide for Residential Buildings in Hurricane-Prone Regions designates the entire state of Hawai'i as a hurricane-prone region at risk of high-wind hazards.

35.     Defendants had specific knowledge of the high wildfire risk on Maui. Hawaiian Electric Industries ("HEI"), the parent company of MECO and HECO, submitted a 2022 request for funding from the Public Utilities Commission to offset the $189.7 million that HEI would need to spend in order to bolster its power grid state-wide, which included wildfire-prevention measures.[5]

36.     Jennifer Potter, a member of the Hawaii Public Utilities Commission who lived in Lahaina, confirmed that Defendants knew about the high wildfire risk to Maui. She noted, "There

---

[5] Id.

16

was absolutely knowledge within the state and within the electric industry that fire was a huge,

huge concern on the island of Maui, and even more so than any of the other islands."[6]

37.     As a matter of fact, Defendants indicated in their funding request that "[t]he risk of

a utility system causing a wildfire ignition is significant" and that Defendants sought funding, in

part, to guard against their facilities being "the origin or a contributing source of ignition for a

wildfire."[7]

38.     Prior to August 8, 2023, Defendants had a duty to properly maintain and repair the

electric transmission lines, and other equipment including utility poles associated with their

transmission of electricity, and to keep vegetation properly trimmed and maintained so as to

prevent contact with overhead power lines and other electric equipment.  In the construction,

repair, maintenance, inspection, and operation of such equipment, utility poles, and power lines,

the Defendants, and each of them, had an obligation to comply with statutes, regulations, and

standards, specifically including, but not limited to HRS 269-6, HRS 269-27.6, Chapter 6-73,

Hawaii Administrative Rules, "Installation, Operation, and Maintenance of Overhead and

Underground Electrical Supply and Communication Lines" (adopted 2007), Hawaii State Public

Utilities Commission, General Order No. 6 and 7, National Electrical Code, NFPA No. 70 (2008),

National Electrical Safety Code, American Standard Code for Electricity Meters, ASA C-12,

American Standard Requirements, Terminology and Test Code for Instrument Transformers,

ASA C57.13.  In addition, the Defendants, and each of them, were specifically aware that such

standards and regulations were minimum standards and that Defendants, and each of them, had a

---

[6] Id.

[7] Brianna Sacks, Hawaii utility faces scrutiny for not cutting power to reduce fire risks, THE WASHINGTON POST, (Aug. 12, 2023), https://www.washingtonpost.com/climate-environment/2023/08/12/maui-fire-electric-utility/?utm_campaign=wp_post_most&utm_medium=email&utm_source=newsletter&wpisrc=nl_most.

duty to make their lines safer under all the exigencies created by the surrounding circumstances and conditions, including, installing or relocating overhead power lines underground, ensuring utility poles could withstand high wind speeds without breaking, deenergizing powerlines during dangerous conditions, ensuring the public received timely warning of wildfires through its adopted policies and procedures, and those failures to do so constituted negligence and would expose members of the general public to a serious risk of injury or death.

39.     It is uncontested that overhead power lines are more vulnerable to adverse weather conditions and objects contacting lines and require more frequent repair.  At all times relevant, Defendants knew that dangerous weather conditions were imminent and that the likelihood of overhead transmission lines contacting surrounding vegetation was great.  Despite this knowledge, Defendants failed to timely deenergize their electrical lines.  These and other failures identified herein caused and/or contributed to the ignition and spread of the Maui Fires and the failure to warn the public of same.

40.     Moreover, utility poles made of wood in Maui County are far more prone to suffer from advanced wood decay, which significantly reduces the utility poles stability and strength. Upon information and belief, at all times leading up to the Maui Fires, many of the Defendants' utility poles in Maui County were severely deteriorated and damaged by advanced wood decay. Upon information and belief, advanced wood decay caused and/or contributed to the failure of the utility poles and the failure to warn the public of same.  Defendants knew or should have known that the above ground transmission lines in Maui County posed a significant fire hazard.

## Specific Warnings Preceding the Maui Fires

41.     On Friday, August 4, 2023, the NWS in Honolulu posted on X (formerly known as Twitter), that Hawaiʻi could experience "indirect impacts" from Hurricane Dora from Monday,

August 7, 2023 through Wednesday, August, 9, 2023, including "strong and gusty trade winds" and "dry weather and high-fire danger."

42.    On Sunday, August 6, 2023, the NWS issued a fire weather watch and posted a warning on X indicating the following: "Strongest winds in yellow and orange on map result from significant pressure differences between high and low pressures. Combined with dry conditions, these winds pose a serious fire and damaging wind threat. Stay alert!" Also, the NWS posted an update on Hurricane Dora on X, which included the following warning: "While Hurricane Dora passes well south with no direct impacts here, the strong pressure gradient between it and the high pressure to the north creates a threat of damaging winds and fire weather (due to ongoing dry conditions) from early Monday to Wednesday."





43.     On Monday, August 7, 2023, the NWS issued an updated warning for the Hawaiian Islands, as reported in *The Maui News*. This warning contained both a High Wind Watch and a Fire Warning for the leeward sides of the state, which included Lahaina. The warning cautioned that damaging and powerful winds could knock down power lines and that any fires that could develop would likely spread rapidly.[8]

44.     On Tuesday, August 8, 2023, the NWS issued both a High Wind Warning and Red Flag Warning for portions of the Hawaiian Islands, including West Maui. More specifically, the NWS warned the following: "High Wind: 30-45 miles per hour winds, gust up to 60 miles per

---

[8] *National Weather Service issues high wind watch, fire warning in effect through late Tuesday*, MAUI NEWS, (Aug. 7, 2023), https://www.mauinews.com/news/local-news/2023/08/national-weather-service-issues-high- wind-watch-fire-warning-in-effect-through-late-tuesday/.

hour. . . . Red Flag: High fire danger with rapid spread. NO outdoor burning. Stay safe and cautious!"



45.    According to the NWS, a Red Flag Warning "means that critical fire weather conditions are either occurring now or will shortly. A combination of strong winds, low relative humidity, and warm temperatures can contribute to extreme fire behavior."

46.    Despite Defendants' knowledge about these Red Flag and other warnings, Defendants left their powerlines energized. These powerlines foreseeably ignited the fast-moving, deadly, and destructive Lahaina Fire, which completely destroyed residences, businesses, churches, schools, and historic cultural sites.

47.    Defendants knew that the high winds the NWS predicted would topple power poles, knock down power lines, and ignite vegetation. Defendants also knew that if their overhead electrical equipment ignited a fire, it would spread at a critically rapid rate.

48.     Defendants also knew that their overhead electrical infrastructure did not use available technologies to mitigate fire risk, including non-expulsion fuses, covered conductors, underground power lines, composite power poles, and fiberglass and other non-wood materials.

49.     On August 8, 2023, at approximately 6:37 a.m., an individual reported a brush fire near Lahainaluna Road. Authorities ordered immediate evacuations minutes later at 6:40 a.m., in the areas surrounding the Lahaina Intermediate School and completely closed Lahainaluna Road between Kelawea Street and Kuialua Street.[9]

50.     Firefighters responded to and fought the fire near Lahainaluna Road in high wind conditions throughout the day. Around 3 p.m. or 3:30 p.m., fire crossed the Lahaina Bypass.

51.     At around 4:45 p.m. on August 8, 2023, Maui Now reported that "[a]n apparent flareup of the Lahaina Fire forced closure of the Lahaina Bypass around 3:30 p.m. Evacuations are occurring in the vicinities of Lahainaluna Road, Hale Mahaolu, and Lahaina Bypass. . . Multiple roads including Honoapiʻilani highway from Hokiokio Place to Lahaina Bypass, are closed due to downed power lines."[10]

52.     The Lahaina Fire caused the destruction of the town of Lahaina, killing at least 115 people and destroyed thousands of residences and businesses.

53.     The below Google Earth map image depicts the location where the Lahaina Fire reportedly first ignited. One of Defendants' power substations is located near where both the initial

---

[9] *Fire crews battling brush fire in Lahaina; residents in area evacuated,* MAUI NOW, (Aug 8, 2023), https://mauinow.com/2023/08/08/haleakala-highway-closure-due-to-brush-fire-evacuation-of-kula-200-off-auli%CA%BBi-dr/.

[10] *Evacuation orders for part of Lahaina due to apparent flareup of West Maui fire*, MAUI NOW, (Aug. 8, 2023), https://mauinow.com/2023/08/08/haleakala-highway-closure-due-to-brush-fire-evacuation-of-kula-200-off-auli%CA%BBi-dr/.

three-acre fire started and where authorities reported a downed power line early in the morning on August 8, 2023.



54.     Defendants owed a duty to design, construct, inspect, repair, and maintain their power poles, power lines, transformers, reclosers, insulators, and/or other electrical equipment adequately. Defendants also owed a duty to maintain, operate, and manage their power lines, overhead electrical infrastructure, and equipment to properly ensure that they would not cause a fire. These duties included de-energizing their power lines during Red Flag Warnings to prevent fires and conducting adequate vegetation management practices, such as clearing vegetation, trees, and tree limbs that could come in contact with their power lines and electrical equipment. Additionally, Defendants knew that their electrical infrastructure was inadequate, aging, and/or vulnerable to foreseeable and known weather conditions. Ultimately, Defendants failed to fulfill each of these duties.

55.     As electric utilities, Defendants were engaged in dangerous activity, and accordingly, owed a heightened duty of care to the public to avoid foreseeable risks attendant to this activity, including the risk of fire. This heightened duty of care included exercising a very high degree of care and prudence, such as ensuring the safe transmission of electricity over their

infrastructure during high-wind gust events and monitoring weather conditions that would affect their electrical infrastructure (i.e., forecasted high-wind gusts and Red Flag Warnings). Defendants also owed the public the duty to mitigate damage to their electrical infrastructure from high winds, specifically, to prevent a wildfire. Defendants further owed a duty to design and construct their power poles and power lines to perform safely and not fail during foreseeable wind events that would endanger Plaintiff's life and property.

56.     Defendants failed to take these steps, and on August 8, 2023, *Hawaii News Now* reported that "[m]ore than 30 downed power poles" were "reported on Maui."[11]

57.     *Maui Now* reported that Defendants were working to restore power to over 12,000 customers and reminded readers that they should assume a downed power line "is energized and dangerous." The same article included depictions of downed, leaning, and/or damaged power poles, many touching vegetation below them.[12]

---

[11] Kiana Kalahele, *More than 30 downed power poles reported on Maui; thousands without power*, HAWAII NEWS NOW, (Aug. 8, 2023), https://www.hawaiinewsnow.com/2023/08/08/strong-winds-knock-out-power-thousands- statewide/.

[12] *High winds result in power outages to thousands in West Maui, Olinda Piʻiholo*, MAUI NOW, (Aug. 8, 2023), https://mauinow.com/2023/08/08/high-winds-result-in-power-outages-in-west- maui-olinda-pi%CA%BBiholo-and-moloka%CA%BBi/.







58.     The practice of deenergizing power lines during fire weather conditions is common

in the Western United States. California utilities, such as Southern California Edison Company,

Pacific Gas & Electric, and San Diego Gas & Electric, have all implemented Public Safety Power

Shutoffs ("PSPS") during Red Flag and High Wind events. These utilities have implemented PSPS for years to prevent wildfires.

59.     In 2019, Defendants issued a Press Release, attached as Exhibit A ("2019 Press Release"). In this Press Release, Defendants expressed their commitment to conduct drone surveys across their five-island territory to identify areas vulnerable to wildfires and to determine the best course of action to protect the public and electrical infrastructure. In addition, the 2019 Press Release stated that the drone inspections formed part of Defendants' "proactive assessment and management of vegetation near their electrical infrastructure, especially in drought-prone or dry brush areas." The 2019 Press Release also indicated that HEI, MECO, and HECO evaluated and studied the Wildfire Mitigation Plan that the major California utilities had filed with the California Public Utilities Commission. These Wildfire Mitigation Plans included a PSPS program for shutting off the power to their power lines during High Wind and Red Flag conditions to prevent wildfires.

60.     Defendants never created a PSPS plan. In fact, according to *The Washington Post*, Defendants were "aware that a power shut-off was an effective strategy, documents show, but had not adopted it as part of its fire mitigation plans, according to [HEI] and two former power and energy officials." Defendants knew shutting off power is "a successful way to prevent wildfires when additional robust techniques are not in place."[13]

---

[13] Sacks, *supra*, https://www.washingtonpost.com/climate-environment/2023/08/12/maui-fire-electric-utility/?utm_campaign=wp_post_most&utm_medium=email&utm_source=newsletter&wpisrc=nl_most.

61.     Jennifer Potter also described Defendants as "not as proactive as they should have been" and further criticized them for not taking meaningful steps to address their "inadequacies in terms of wildfire."[14]

62.     According to *The Washington Post*, "Hawaii is powered by a grid that uses old wooden poles that are largely uninsulated and strung with lush vegetation over miles of rugged terrain, according to utility specialists," and "residents and energy experts said they have long called for the utility to harden its grid, and despite the cost, to put more of it underground."[15]

63.     Michael Wara, a wildfire expert who directs the Climate and Energy Policy Program at Stanford University, said that the pattern of the Lahaina Fire "suggests that a spate of small ignitions combine to form a bigger blaze" and "the only real source of that is power lines."[16]

64.     The severe and catastrophic losses suffered as a result of the Lahaina Fire could have easily been prevented had Defendants implemented a PSPS plan prior to the fire igniting. Defendants could have also taken other reasonable steps to prevent their electrical equipment from igniting the fire.

65.     The Mayor of Maui noted that the downed power poles added to the chaos surrounding the Lahaina Fire, as downed power poles with live wires still attached cut off two important roads, leaving only the narrowest highway.[17]

---

[14] Id.
[15] Id.
[16] Id.
[17] Ty O'Neil, Claire Rush, Jennifer Sinco Kelleher & Rebecca Boone, Maui residents had little warning before flames overtook town; at least 55 people died, abc7: EYEWITNESS NEWS, (Aug. 11, 2023), https://abc7.com/hawaii-wildfire-wildfires-strong-winds-maui/13632163/; Brianna Sacks, Hawaii utility faces scrutiny for not cutting power to reduce fire risks, THE WASHINGTON POST, (Aug. 12, 2023), https://www.washingtonpost.com/climate-environment/2023/08/12/maui-fire-electric-utility/?utm_campaign=wp_post_most&utm_medium=email&utm_source=newsletter&wpisrc=nl_most.

## THE UPCOUNTRY FIRES – OLINDA AND KULA FIRES

66.     At approximately 10:47 pm on August 7, 2023, security camera footage at the Maui Bird Conservation Center recorded a bright flash in the woods.[18]

67.     At the moment of the flash, 10 sensors in Makawao, a town in close proximity to Kula recorded a significant fault in Defendants' grid, according to data from Whisker Labs, a company who uses an advanced sensor network to monitor power grids across the United States.[19]

68.     A fault typically occurs when a power line comes in contact with something – often another power line, vegetation, or after being knocked down and falling to the ground.

69.     Plaintiff is informed and believes this is the first time during the complex of Maui fires that an electrical arc has been caught on video and linked with contemporaneous data that confirms Defendants' power grid experienced a fault at the same time.

70.     Shortly before midnight, there were reports of a brush fire near Olinda Road near Kula that was rapidly spreading across pastures, thick trees, and brush. Unfortunately, the Olinda Fire burned through more than 1,000 acres in the community of Kula and completely destroyed multiple structures.  This fire is now commonly referred to as the "Olinda Fire."

71.     At approximately 11:30 a.m. at the intersection of Haleakala Hwy. and Kualono Place, a large crash was heard by several people in the area.  Bystanders observed several trees that had fallen across Haleakala Hwy and knocked down power lines.

72.     At about the same time, fire was observed around the base of a power pole on Kualono Place.  The fire grew quickly with the strong winds, and began to spread northwest

---

[18] https://www.washingtonpost.com/climate-environment/2023/08/15/maui-fires-power-line-cause/#
[19] https://www.washingtonpost.com/climate-environment/2023/08/15/maui-fires-power-line-cause/

towards the gulch and Haleakala Hwy and into surrounding homes and structures.  This fire is now commonly referred to as the "Kula Fire."

73.     Defendants are, and were, aware of the danger from fires in Maui County during the summer months when environmental conditions are favorable for extensive conflagration and high temperatures, absence of moisture, and the prevalence of wind, which renders the extinguishment of a burning fire difficult.

74.     Utility poles, wires and other equipment carrying electricity are dangerous instrumentalities and a hazardous and dangerous activity requiring the exercise of increased care commensurate with and proportionate to that increased danger so as to make the transport of electricity through wires safe under all circumstances and exigencies offered by the surrounding environment, including the risk of fire.

75.     Defendants failed in their duty to exercise care commensurate with and proportionate to the combined danger of an area susceptible to wildfire and dangerous activity of wires carrying electricity, thereby being a substantial factor in the cause of the fires, as more fully set forth below.

76.     The conditions and circumstances existing at the time of the ignition in known fire origin areas, including the extended drought, high winds, high temperatures, low humidity, and tinder-like dryness of vegetation, were reasonably foreseeable, if not expect, by a reasonable and prudent person and were reasonably foreseeable by and to be expect by, Defendants, especially with their special knowledge and expertise.

77.     Further, Defendants designed their powerlines to transport electricity to its substations and from the substations to the public directly into their homes. The powerlines' circuitry and conductors were electrically a single and unified circuit that transmitted electricity.

78.     Defendants designed, constructed, used, and maintained their utility infrastructure's system protection devices (which are used to respond to an overcurrent event) in a manner that would keep their powerlines energized for too long after a transmission line failure, allowing a fire to ignite. Defendants could have designed the system protection devices to shut off faster but failed to do so because tripping the circuit costs time and money. Defendants' decision was a cost-saving one that allowed older, slower equipment to remain in place.

79.     Defendants designed their powerlines to be uninsulated, bare, and/or uncovered conduit carrying high voltage electricity that posed an increased risk of igniting should they come into contact with vegetation or other electrical equipment. Defendants could have designed their powerlines to be insulated and covered, and therefore less likely to ignite vegetation, but failed to do so.

80.     Defendants constructed their powerlines such that they traveled above ground using wooden poles, more likely than not suffering from advanced wood decay, and left dry, overgrown vegetation below them. Defendants could have constructed their powerlines to travel underground, a request residents and energy experts have made many times, but Defendants ignored. Defendants also could have removed nearby vegetation entirely but failed to do so.

81.     Defendants designed and constructed their powerlines so that they would reenergize to soon after being deenergized. Defendants could have designed and constructed their power lines with reclosers that operated more safely but failed to do so.

82.     Defendants had a responsibility to maintain and continuously upkeep their utility infrastructure, including their powerlines, and to implement vegetation management programs and protocols to ensure the safe delivery of electricity to the public. They failed to do so and allowed their infrastructure to age and deteriorate.

83.     Defendants knew that deenergizing powerlines is an effective way to prevent wildfires during periods of elevated fire danger, including during high wind events. Electric utilities have long used intentional temporary outages to prevent fires. In California, Oregon, Nevada and other states, downed power lines, sparks from transmission hubs, and other electrical-grid failures have started or spread some of the deadliest and most destructive blazes in U.S. history. That has prompted these states proactively to shut down power to communities when red-flag conditions arise. Defendants recognized that a power shut-off plan could be effective, especially after it reviewed what happened with California's 2018 Camp Fire, which killed 85 people. Last year, Defendants pointed to California's Public Power Shutoff Plan as a successful way to prevent wildfires when additional robust techniques are not yet in place.

84.     Yet, when fire potential in and near Maui County was well above normal levels on August 6, and August 7, 2023, due in part to extreme drought conditions, dry brush, and high winds caused by Hurricane Dora passing on the South, Defendants kept their power lines active.

85.     As a result of Defendants' actions and inactions, Defendants have caused Plaintiff MAUI COUNTY to suffer injuries and damages including, but not limited to, the following: loss of natural resources, open space, and public lands; loss of public parks; property damages including real and personal property; staff labor costs, including overtime labor costs; fire suppression costs including, materials, and other fire suppression damages; emergency response and rescue costs; evacuation expenses; loss of tax revenue including property, sales, and transient occupancy taxes; losses from impacts on business-like activities; costs associated with response and recovery including debris removal, and other costs; damage to infrastructure including but not limited to roads, sidewalks, water, stormwater and sewer systems, and underground infrastructure, and other public entity-owned infrastructure; damages based on soil erosion and loss of soil

stability and productivity; damages related to water contamination including water quality preservation and correction expenses; loss of water storage and increased sedimentation; loss of aesthetic value; and other significant damages and losses directly related to and caused by the Maui Fires.

86.     A further enumerated list of impacts to MAUI COUNTY includes, but is not limited to, the following:

a.     Fire suppression costs;

b.     Administration, funding, and operation of emergency operations centers;

c.     Administration, funding, and operation of evacuation centers and shelters;

d.     Securing and managing burn areas, including safe re-entry for the public;

e.     Staff overtime, labor costs, personnel, and other materials;

f.     Additional law enforcement costs;

g.     Lost work and productivity due to public entity employees unable to return to work;

h.     Loss of natural resources, open space, wildlife, and public lands;

i.     Loss of parks, including damage to real property and to recreational opportunities and programs, and the revenue generated therefrom;

j.     Destruction or damage to public infrastructure, including but not limited to roads, sidewalks, water storage facilities, water distribution systems, sewer collection systems, stormwater systems, fire stations, and other infrastructure;

k.     Damage or harm to facility and infrastructure lifespan, including water treatment facilities and landfills;

l.     Costs of debris removal and related administrative obligations;

m.      Costs of facilitating/administering community rebuilding efforts, staffing and administration of permitting centers;

n.      Costs of administering community outreach efforts, including towards revisions to new ordinances, guidelines, and rules, and housing assistance programs and policies;

o.      Costs of watershed, waterway, and water body management and protection;

p.      Damages related to soil erosion and mitigation, loss of soil stability and productivity, including management of risk of debris flow and landslides;

q.      Damages related to water contamination, including water quality preservation and correction expenses, including but not limited to repair and/or replacement of water treatment facilities or systems;

r.      Loss of tax revenues such as property, sales, business, and transient occupancy taxes;

s.      Loss of business like or proprietary revenues, such as airport use, facility rentals, educational and recreational programs, and others;

t.      Damages related to loss of workforce housing;

u.      Damages associated with tourism and economic development, such as overall branding and reputation;

v.      Damages resulting from short- and long-term public health impacts, including costs to provide educational, outreach, and other services; and

w.      Other impacts, injuries, and damages not yet identified, including those unique to public entities.

## COUNT I—NEGLIGENCE

### (Against MECO, HECO, HELCO, HEI, and DOES 1 through 50)

87.     Plaintiff hereby realleges and incorporates by reference each and every allegation contained above.

88.     Plaintiff brings this cause of action for negligence against all Defendants, and/or each of them.

89.     Defendants and/or each of them were under a duty to maintain the electrical systems in their possession in a reasonably safe condition.

90.     At all relevant times, Defendants and/or each of them, operated, controlled, designed, possessed, installed, constructed, inspected, maintained, and managed the electrical systems.

91.      Defendants have a non-delegable duty of vigilant oversight in the maintenance, use, operation, repair and inspection appropriate to the changing conditions and circumstances of their electrical transmission and distribution systems have special knowledge and expertise far above that of a layperson that they were required to apply to the design, engineering, construction, use, operation, inspection, repair and maintenance of electrical lines, infrastructure, equipment and vegetation in order to assure safety under all the local conditions in their service area, including but not limited to, those conditions identified herein.

92.     Defendants, and each of them, have special knowledge and expertise far above that of a layperson that they were required to apply to the design, engineering, construction, use, operation, inspection, repair and maintenance of electrical lines, infrastructure, equipment and vegetation in order to assure safety under all the local conditions in their service area, including but not limited to, those conditions identified herein.

93.     The negligence of Defendants was a substantial factor in causing Plaintiff's damages.

94.     The fire was a direct and legal result of the negligence, carelessness, and recklessness, and/or unlawfulness of Defendants and/or each of them. Defendants and/or each of them, breached their respective duties owed individually and/or collectively to Plaintiff by, including but not limited to:

a.     Failing to design, construct, inspect, repair, and maintain their power poles, power lines, transformers, reclosers, and other electrical equipment adequately;

b.     Failing to maintain, operate, and inspect their power lines, overhead electrical infrastructure, and equipment properly to ensure they would not ignite a fire;

c.     Failing to de-energize their power lines during a Red Flag Warning to prevent fires;

d.     Failing to de-energize their power lines during a High Wind Watch to prevent fires;

e.     Failing to de-energize their power lines during high fire danger warnings;

f.     Failing to conduct adequate vegetation management, such as clearing vegetation, trees, and tree limbs, that could come into contact with their power lines and equipment;

g.     Failing to de-energize their power lines after Defendants had knowledge that some power lines had fallen or otherwise come into contact with vegetation, structures, and objects;

h.     Failing to de-energize their power lines after Defendants' overhead electrical infrastructure had ignited fires;

  i.  Failing to implement reasonable policies, procedures, and equipment that would avoid igniting or spreading fire;

  j.  Failing to adjust their operations despite warnings about fire weather conditions that could result in downed power lines and cause rapid and dangerous fire growth and spread on and after August 8, 2023; and

  k.  Failing to prevent the downing of power lines, which blocked evacuation routes during the Maui Fires.

95.  Defendants' failure to comply with their duty of care proximately caused damage to Plaintiff.

96.  As a further direct and proximate result of Defendants' negligence, Plaintiff incurred significant and actual damages, as described herein and in an amount to be proven at trial.

97.  Plaintiff suffered injuries and damages including but not limited the following: damage to and loss of natural resources, open space, parks, and public lands; property damages including  real and personal property damages, including loss of and damage to vegetation, trees, infrastructure, and structures; increased staff labor costs, including overtime labor costs to respond to and manage the Maui Fires and ensure the safety of the citizens of Maui County and other surrounding communities; fire suppression costs, including personnel, overtime labor costs, materials, and other fire suppression damages; evacuation expenses; costs associated with debris removal; damage to infrastructure, including but not limited to roads, sidewalks, water, stormwater and sewer systems, underground infrastructure and other public-entity owned infrastructure; damages based on fire-related soil erosion, loss of soil stability and productivity; damages related to water contamination including water quality preservation and correction expenses; loss of water storage; loss of aesthetic value; loss of tax revenue, including property, sales, and transient

occupancy damages; losses from impacts on business-like activities; and other significant injuries, damages and losses directly related to and caused by the Maui Fires.  Plaintiff suffered other injuries and damages not yet identified including those unique to public entities.

98.     Defendants' conduct was intentional and malicious, and in complete disregard to the rights of Plaintiff, subjecting Defendants to awards of punitive damages.

## COUNT II—GROSS NEGLIGENCE

### (Against MECO, HECO, HELCO, HEI, and DOES 1 through 50)

99.     Plaintiff hereby realleges and incorporates by reference each and every allegation contained above as though the same were set forth herein in full.

100.     Defendants knew of the extreme fire danger that the high wind gusts posed to their overhead electrical infrastructure, particularly during Red Flag conditions. These risks included the fact that winds could topple power poles and power lines, causing them to fall to the ground, ignite vegetation, and cause a wildfire that would spread quickly.

101.     Defendants' 2019 Press Release indicates their knowledge of the known risks of wildfires associated with powerful, high-wind gusts.

102.     Despite Defendants' knowledge of these extreme risks, Defendants chose not to de-energize their power lines during the High Wind Watch and Red Flag Warning conditions for Maui prior to the Maui Fires starting.

103.     Defendants chose not to de-energize their power lines even after they knew some power poles and power lines had fallen and came in contact with the vegetation or the ground.

104.     Further, Defendants failed to de-energize their power lines, even after the Maui Fires started.

105.    Defendants acted with indifference to the probable consequences of their acts and/or omissions.

106.    In the face of knowledge of the risk of high, powerful winds and wildfires generally, a High Wind Watch, a Red Flag Warning, and specific warnings that high winds could blow down power poles and that fires would spread rapidly, Defendants did nothing.

107.    Defendants' gross negligence was the direct and proximate cause of the damages and injuries that Plaintiff suffered.

108.    As a further direct and proximate result of Defendants' negligence, Plaintiff incurred significant and actual damages, as described herein and in an amount to be proven at trial.

109.    Plaintiff suffered injuries and damages including but not limited the following: damage to and loss of natural resources, open space, parks, and public lands; property damages including  real and personal property damages, including loss of and damage to vegetation, trees, infrastructure, and structures; increased staff labor costs, including overtime labor costs to respond to and manage the Maui Fires and ensure the safety of the citizens of Maui County and other surrounding communities; fire suppression costs, including personnel, overtime labor costs, materials, and other fire suppression damages; evacuation expenses; costs associated with debris removal; damage to infrastructure, including but not limited to roads, sidewalks, water, stormwater and sewer systems, underground infrastructure and other public-entity owned infrastructure; damages based on fire-related soil erosion, loss of soil stability and productivity; damages related to water contamination including water quality preservation and correction expenses; loss of water storage; loss of aesthetic value; loss of tax revenue, including property, sales, and transient occupancy damages; losses from impacts on business-like activities; and other significant injuries,

damages and losses directly related to and caused by the Maui Fires. Plaintiff suffered other injuries and damages not yet identified including those unique to public entities.

110.   Defendants' conduct was intentional and malicious, and in complete disregard to the rights of Plaintiff, subjecting Defendants to awards of punitive damages.

## COUNT III—NUISANCE

### (Against MECO, HECO, HELCO, HEI, and DOES 1 through 50)

111.   Plaintiff hereby realleges and incorporates by reference each and every allegation contained above as though the same were set forth herein in full.

112.   Plaintiff has a possessory interest in his real property, including the right to the quiet use and enjoyment of his property.

113.   Defendants acted unreasonably, negligently, and recklessly in designing, constructing, inspecting, repairing, managing, owning, operating, and/or maintaining their power poles, power lines, transformers, reclosers, and other electrical equipment inadequately.

114.   Defendants acted unreasonably, negligently, and recklessly in maintaining, operating, and inspecting their power poles, power lines, overhead electrical infrastructure, and equipment to ensure they would not cause a fire.

115.   Defendants acted unreasonably, negligently, and recklessly in failing to de-energize their power lines during a Red Flag Warning.

116.   Defendants acted unreasonably, negligently, and recklessly in failing to de-energize their power lines during a High Wind Watch.

117.   Defendants acted unreasonably, negligently, and recklessly in failing to de-energize their power lines once they knew that wind had knocked down the power poles, putting the power lines in contact with vegetation.

118.    Defendants acted unreasonably, negligently, and recklessly in failing to de-energize their power lines immediately after the Maui Fires ignited.

119.    Defendants' unreasonable, negligent, and reckless acts resulted in an invasion of Plaintiff's private use and enjoyment of his land.

120.    The gravity of harm from Defendants' conduct outweighs any utility associated with keeping the power lines energized during a High Wind Watch, a Red Flag Warning, once Defendants' power poles failed, and once the Maui Fires started.

121.    Defendants' 2019 Press Release reflects their knowledge that high winds posed a high risk of safety to the public. In addition, Defendants reviewed and studied various Wildfire Mitigation Plans that included PSPS during the very kinds of conditions preceding and during the Maui Fires. Defendants also knew, or should have known, about the High Wind Watch and Red Flag Warning.

122.    Defendants took an unreasonable risk in failing to de-energize their power lines.

123.    Defendants' many failures resulted in serious harm to Plaintiff, depriving him of the quiet use and enjoyment of his property.

124.    As a further direct and proximate result of Defendants' conduct, Plaintiff incurred significant and actual damages, as described herein and in an amount to be proven at trial.

125.    Plaintiff suffered injuries and damages including but not limited the following: damage to and loss of natural resources, open space, parks, and public lands; property damages including  real and personal property damages, including loss of and damage to vegetation, trees, infrastructure, and structures; increased staff labor costs, including overtime labor costs to respond to and manage the Maui Fires and ensure the safety of the citizens of Maui County and other surrounding communities; fire suppression costs, including personnel, overtime labor costs,

materials, and other fire suppression damages; evacuation expenses; costs associated with debris removal; damage to infrastructure, including but not limited to roads, sidewalks, water, stormwater and sewer systems, underground infrastructure and other public-entity owned infrastructure; damages based on fire-related soil erosion, loss of soil stability and productivity; damages related to water contamination including water quality preservation and correction expenses; loss of water storage; loss of aesthetic value; loss of tax revenue, including property, sales, and transient occupancy damages; losses from impacts on business-like activities; and other significant injuries, damages and losses directly related to and caused by the Maui Fires.  Plaintiff suffered other injuries and damages not yet identified including those unique to public entities.

126.   Defendants' conduct was intentional and malicious, and in complete disregard to the rights of Plaintiff, subjecting Defendants to awards of punitive damages.

## COUNT IV—ULTRAHAZARDOUS ACTIVITY

## (Against MECO, HECO, HELCO, HEI, and DOES 1 through 50)

127.   Plaintiff hereby realleges and incorporates by reference each and every allegation contained above as though the same were set forth herein in full.

128.   Defendants conducted an abnormally dangerous activity by maintaining power in their power lines during a High Wind Watch and Red Flag Warning that specifically cautioned that high winds could topple power poles and that any fire that started would likely spread rapidly.

129.   Thus, Defendants owed a heightened duty of care to the public and Plaintiff. This heightened duty required Defendants to exercise the highest possible degree of skill, care, caution, diligence, and foresight in maintaining power in their power lines during a High Wind Watch and Red Flag Warning.

130.    Maintaining power in their power lines during a High Wind Watch and Red Flag Warning, during which the NWS warned that power poles were at risk of being blown over by strong winds and in which any fire that started would spread rapidly, is an abnormally dangerous activity, subjecting Defendants to strict liability.

131.    The risk of harm to the public and Plaintiff was high, given the high winds and drought conditions.

132.    There was a high likelihood that maintaining power to the power lines during a High Wind Watch and Red Flag Warning would result in power lines blowing over and putting live power lines in contact with vegetation.

133.    Defendants could not eliminate the risk associated with maintaining power to their power lines during a High Wind Watch or Red Flag Warning and also engage in this abnormally dangerous activity.

134.    The practice of de-energizing power lines during fire weather conditions is commonplace in the Western United States. Defendants maintained power in their overhead electrical infrastructure during a High Wind Watch and Red Flag Warning in a manner outside common usage.

135.    Maintaining power in their overhead electrical infrastructure during a High Wind Watch and Red Flag Warning was inappropriate in Maui, given the extreme drought conditions and high-fire risk weather forecast.

136.    Nothing about maintaining the power in Defendants' power lines outweighs the dangerous risk of keeping the electrical infrastructure energized, given the High Wind Watch and Red Flag Warning.

137.    As a further direct and proximate result of Defendants' conduct, Plaintiff incurred significant and actual damages, as described herein and in an amount to be proven at trial.

138.    Plaintiff suffered injuries and damages including but not limited the following: damage to and loss of natural resources, open space, parks, and public lands; property damages including  real and personal property damages, including loss of and damage to vegetation, trees, infrastructure, and structures; increased staff labor costs, including overtime labor costs to respond to and manage the Maui Fires and ensure the safety of the citizens of Maui County and other surrounding communities; fire suppression costs, including personnel, overtime labor costs, materials, and other fire suppression damages; evacuation expenses; costs associated with debris removal; damage to infrastructure, including but not limited to roads, sidewalks, water, stormwater and sewer systems, underground infrastructure and other public-entity owned infrastructure; damages based on fire-related soil erosion, loss of soil stability and productivity; damages related to water contamination including water quality preservation and correction expenses; loss of water storage; loss of aesthetic value; loss of tax revenue, including property, sales, and transient occupancy damages; losses from impacts on business-like activities; and other significant injuries, damages and losses directly related to and caused by the Maui Fires.  Plaintiff suffered other injuries and damages not yet identified including those unique to public entities.

139.    Defendants' conduct was intentional and malicious, and in complete disregard to the rights of Plaintiff, subjecting Defendants to awards of punitive damages.

## COUNT V—INJUNCTIVE RELIEF

### (Against MECO, HECO, HELCO, HEI, and DOES 1 through 50)

140.    Plaintiff hereby realleges and incorporates by reference each and every allegation contained above as though the same were set forth herein in full.

141.    Plaintiff seeks an order enjoining Defendants from leaving their power lines energized in high fire risk areas of Maui during Red Flag Warning and/or High Wind Warning conditions.

142.    Plaintiff seeks an order requiring Defendants to use tools and technologies to mitigate the risk of fire, including but not limited to, burying transmission lines, using covered conductors and non-expulsion fuses, and disabling automatic reclosers during fire weather conditions.

## COUNT VI—TRESPASS

### (Against MECO, HECO, HELCO, HEI, and DOES 1 through 50)

143.    Plaintiff hereby realleges and incorporates by reference each and every allegation contained above as though the same were set forth herein in full.

144.    At all times relevant herein, Plaintiff was the owner, tenant, and/or lawful occupier of property damaged by the fire.

145.    Defendants negligently allowed the fire to ignite and/or spread out of control, which caused significant damage to Plaintiff.

146.    Defendants caused an intrusion on Plaintiff's land that invaded Plaintiff's interest in the exclusive possession of its land. This intrusion occurred as a result of Defendants' ultrahazardous activity, and/or as a result of their negligent and/or reckless conduct.

147.    Defendants were aware that a trespass could result from their actions and inactions.

148.    Plaintiff did not grant permission to Defendants to cause the fire to enter its property.

149.    As a direct and proximate result of the trespass, Plaintiff incurred significant and actual damages, as described herein and in an amount to be proven at trial.

150.    Plaintiff suffered injuries and damages including but not limited the following: damage to and loss of natural resources, open space, parks, and public lands; property damages including  real and personal property damages, including loss of and damage to vegetation, trees, infrastructure, and structures; increased staff labor costs, including overtime labor costs to respond to and manage the Maui Fires and ensure the safety of the citizens of Maui County and other surrounding communities; fire suppression costs, including personnel, overtime labor costs, materials, and other fire suppression damages; evacuation expenses; costs associated with debris removal; damage to infrastructure, including but not limited to roads, sidewalks, water, stormwater and sewer systems, underground infrastructure and other public-entity owned infrastructure; damages based on fire-related soil erosion, loss of soil stability and productivity; damages related to water contamination including water quality preservation and correction expenses; loss of water storage; loss of aesthetic value; loss of tax revenue, including property, sales, and transient occupancy damages; losses from impacts on business-like activities; and other significant injuries, damages and losses directly related to and caused by the Maui Fires.  Plaintiff suffered other injuries and damages not yet identified including those unique to public entities.

## **PRAYER FOR RELIEF**

Plaintiff seeks the following damages in an amount according to proof at the time of trial:

(1)    General and/or special damages for all damage to property (real and personal);

(2)    Repair, diminution in value, and/or replacement of damaged, destroyed, and/or lost personal and/or real property;

(3)    Loss of use, benefit, goodwill, and enjoyment of Public Entity Plaintiff's real and/or personal property;

(4)     Loss of revenues (including but not limited to: tax revenues such as property, sales, business, and transient occupancy taxes); staff labor and/or wages; business-like or proprietary revenues (such as airport use, facility rentals, educational and recreational programs); loss of workforce housing; damage to name and reputation; damage to tourism and economic development; loss of earning capacity, and/or related expenses;

(5)     Lost work productivity due to public entity employees being unable to report to work and due to focus on fire recovery instead of normal business practices;

(6)     Loss of natural resources, open space, wildlife, public lands, parks and other recreational areas and revenues generated therefrom;

(7)     Destruction or damage to public infrastructure (e.g., roads, sidewalks, water, stormwater and sewer systems, water storage facilities, water distribution systems, sewer collection systems, stormwater systems, fire stations, and other infrastructure;

(8)     Harm to facility and infrastructure lifespan (e.g., water treatment facilities and landfills);

(9)     Debris removal costs;

(10)    Costs of facilitating/administering community rebuilding efforts, staffing, and administration of permitting centers;

(11)    Costs of facilitating/administering community outreach efforts, including housing assistance programs and policies;

(12)    Costs of watershed, waterway, and water body management and protection;

(13)   Damages related to soil erosion and mitigation, loss of soil stability and productivity, including management of debris flow and landslide risks;

(14)   Damages related to water contamination, including water quality preservation and correction expenses, including, but not limited to repair and/or replacement of water treatment facilities or systems;

(15)   Fire Suppression Costs and costs to rescue and/or emergency medical and/or rescue services;

(16)   Damages and costs for restoration and rehabilitation of land and ecological and/or environmental damages allowable under Hawaii law;

(17)   Law Enforcement costs including, but not limited to, costs to manage and secure burn areas;

(18)   Costs to run emergency operations centers and/or costs to provide evacuation centers and shelters;

(19)   An order to abate the existing and continuing nuisances caused by the Maui Fires;

(20)   Attorneys' fees, expert fees, consultant fees and litigation costs and expense, as allowed under Hawaii law and/or any other statute;

(21)   Damage for wrongful injuries to timber, trees, or underwood on its property, as allowed under Hawaii law;

(22)   For punitive and exemplary damages in an amount according to proof and any and all other statutory or legal basis that may apply;

(23)   Costs of suit;

(24)   Interest allowed by law, including prejudgment interest; and

(25)    Any and all other and further such relief as the Court shall deem proper, all according to proof.

Dated: Wailuku, Maui, Hawaii,  August 24, 2023.

By: /s/ Victoria J. Takayesu

**DEPARTMENT OF THE CORPORATION COUNSEL**
Victoria J. Takayesu (SBN 5481)
Corporation Counsel
Thomas Kolbe (SBN 7679)
Deputy Corporation Counsel

By: /s/ L. Richard Fried Jr.

**CRONIN, FRIED, SEKIYA, KEKINA &FAIRBANKS**
L. Richard Fried Jr. (SBN 000764)
Wayne K. Kekina (SBN 000780)
Patrick F. McTernan (SBN 004269)

*Attorneys for Plaintiff*